**Opinion issued January 11, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00522-CV

———————————

## IN THE INTEREST OF B.J.F., A CHILD

---

### On Appeal from the 313th District Court
### Harris County, Texas
### Trial Court Case No. 2022-00991J

---

## MEMORANDUM OPINION

L.A.L. ("Mother") challenges the trial court's final decree terminating her parental rights to her minor child, B.J.F. ("Beth"), based on the court's finding Mother failed to comply with the provisions of a court order. *See* TEX. FAM. CODE § 161.001(b)(1)(O). Mother argues there is legally and factually insufficient evidence supporting the trial court's findings that (1) she failed to comply with the

provisions of a court order, and (2) termination of her parental rights is in Beth's best interest.

We affirm the decree of termination.

## Background

On June 10, 2022, the Texas Department of Family and Protective Services ("Department") received a referral concerning Mother's neglectful supervision of her three-year-old daughter, Beth.[1]  According to the referral, Mother was arrested for an outstanding warrant for felony fraud and due to her detention, Beth did not have a caregiver.

On June 13, 2022, the Department filed a petition seeking managing conservatorship over Beth and termination of Mother's parental rights.[2]  The Department, which also requested temporary managing conservatorship over Beth on an emergency basis, attached an affidavit from caseworker Angelle Malbrough. Malbrough stated that Beth was taken into care after Mother was detained because Mother "refused to provide potential caregivers stating she would rather place her child in foster care than with her own mother."  Malbrough explained that the

---

[1]  For purposes of this appeal and ease of reference, the term "Department" also includes Harris County Child Protective Services.

 To protect the identity of the minor child, we refer to her by pseudonym and we refer to her biological parents as Mother and Father.  *See* TEX. R. APP. P. 9.8(b)(2).

[2]  The Department also sought and achieved termination of Beth's unknown father's parental rights.

Department received a report on May 22, 2022 that Beth had been sexually abused. At the time, Mother and Beth were living in a motel in Houston, Texas. On May 23, 2022, Malbrough called the phone number the Department had on file for Mother, but the number had been disconnected and Mother and Beth had checked out of the motel and their address was unknown.

On June 1, 2022, a caseworker went to the three possible addresses the Department had obtained for Mother in Houston, Texas. Although the caseworker was not able to locate Mother at the first two addresses, the caseworker spoke to Mother's mother at the third address. Mother's mother reported that Beth and Mother did not live with her, and she did not know where Beth and Mother were located. She did, however, provide the caseworker with an updated phone number for Mother. Malbrough attempted to contact Mother using the new phone number, but no one answered her calls.

On June 3, 2022, Mother texted Malbrough. Malbrough told her she needed to speak to her as soon as possible to discuss the sexual abuse allegations. Although Malbrough continued to contact Mother at that number, Mother did not answer, and Mother's residence was unknown.

On June 10, 2022, the Houston Police Department notified the Department that Mother had been arrested on an outstanding warrant for felony fraud. Malbrough spoke to Mother after her arrest and asked her if she had anyone who

could care for Beth while Mother was in jail. According to Malbrough, Mother repeatedly stated she did not have anyone to care for Beth and she refused to consider her mother as a potential caregiver. Because Mother was unable to provide the Department with a potential caregiver for Beth, the Department took Beth into care.

On June 13, 2022, the day the Department filed its petition, the court held a hearing on the Department's petition and granted the Department's request for temporary managing conservatorship. On July 7, 2022, the court held a temporary adversary hearing and made the requisite findings to keep Beth in the Department's temporary conservatorship pending a full hearing on the merits of the Department's suit.

The record reflects that the Department had difficulty locating Mother after Beth was removed from her care. On June 15, 2022, a Harris County Constable attempted to serve Mother at her mother's residence. Mother was not there, but her mother told the constable that Mother might be staying at a hotel off the Northwest Freeway in Houston, Texas. On June 16, 2022, the constable confirmed that Mother was staying at the hotel. When he tried to serve Mother at the hotel the next morning, Mother failed to come to the door or answer her phone. On June 21, 2022, Mother left a voice mail for the constable stating she had moved out of state. But the constable confirmed with the hotel that Mother had not checked out. A Department worker who had been to the hotel on the previous day knocked on Mother's door.

4

According to the worker, a "female answered [the] door," but quickly shut it and refused to open it again. The constable concluded it had become impractical to serve Mother in person because she was evading service.

The court conducted a trial on May 15, 2023, and May 30, 2023.

## A.   Jasmin Green

Beth's caseworker, Jasmin Green, testified that Beth, who was four years old at the time, came into the Department's care in June 2022 after Mother was arrested on an outstanding warrant for felony fraud. Green testified that Beth was diagnosed with autism spectrum disorder in July 2022. Although she does not have any physical problems, Beth is nonverbal, and she is not on target developmentally or socially. Green estimated that Beth's social development was on the level of a two-year-old.

Green was assigned Beth's case in July 2022 and the first thing she did was create a family service plan ("FSP") for Mother. Mother's FSP, which was admitted into evidence as Petitioner's Exhibit 5, was filed with the trial court on August 4, 2022, and made a part of the court's orders. According to the FSP, the Department was concerned about Mother's ability to care for Beth because Mother (1) did not have a stable home environment, (2) had a history of moving from state to state, (3) was unable to meet Beth's needs, (4) might be suffering from untreated mental health and substance abuse issues, and (5) would pose a safety concern to Beth

5

without Department intervention. To address the Department's concerns, the FSP required Mother to (1) "maintain stable and safe housing for a minimum of six consecutive months," and "demonstrate that she can provide housing that will protect her child and provide the consistency and stability that they need," (2) provide Green with proof of all sources of income, (3) participate in psychosocial evaluation and follow all recommendations, (4) "refrain from all criminal activities," (5) "maintain [a] positive support system that is safe, crime-free, drug/alcohol free," "not incur additional charges," and "continue to abide by the terms regarding her current case," (6) attend court hearings, visitations with Beth, and meetings with the Department, (7) "participate in initial drug/alcohol test," and, if requested, "complete a substance abuse assessment and follow all recommendations," and (8) "maintain contact" with Green and provide Green with "all phone numbers, email and back up contact numbers where [Mother] can be reached."

### 1. Maintain Contact with the Department

Green testified that Mother did not satisfy all of her FSP's requirements, including Mother's requirement to maintain contact with the Department while Beth's case was pending. According to Green, although Mother had provided "e-mails and numerous phone numbers," Mother's contact information changed regularly and her communication with the Department had been "sporadic at best."

6

After she was arrested in June 2022, Mother told Malbrough, the investigative caseworker, that she was renting a room in California, and she provided Malbrough with a California address. Green, who was assigned as Beth's caseworker in July 2022, was not able to contact Mother until August 5, 2022, when she spoke to Mother by phone. During that phone call, Mother told Green she had moved back to California. Green testified that she and Mother "just went over her family plan and a lot of other things" during their initial call. However, when Green called Mother at the same phone number a few days later, on August 11, 2022, an unknown male answered the phone and told Green he had purchased the phone from Mother. Green testified she had to wait for Mother to contact her again because she did not have another phone number for Mother.

Green testified that Mother contacted her again in January 2023, February 2023, and March 2023, and she saw Mother at the March 23, 2023 permanency hearing. According to Green, that was the first time Mother attended a court proceeding in Beth's case. Green met with Mother in person for the first time in April 2023, one month before trial.

The Permanency Hearing Report the Department filed on April 26, 2023, admitted into evidence as Petitioner's Exhibit 9, chronicles in greater detail Green's contacts with Mother from August 2022 through April 2023. The report reflects that Green and Mother spoke on the phone on August 5, 2023, and Mother told Green

7

that she was in California. Mother told Green that she had Beth's birth certificate and immunization records and Mother "wanted to know [how] to get her daughter back." When Green called Mother back at the same number six days later, an unknown male answered the phone and told Green that he had purchased the phone from a female a few days prior. Although it is not reflected in the report, Green testified that Mother contacted her in September 2022. There is no evidence in the record that Mother contacted or attempted to contact the Department again until five months later, on January 7, 2023.

On January 7, 2023, Mother emailed Green from her personal email address and asked Green what she needed to do to be reunited with Beth. On January 11, 2023, Green received a message from another email address "stating that [Mother] was residing in her car in Alabama." Mother testified that this second email address belonged to her sister. On January 13, 2023, Green received another message from Mother, who was still using her sister's email address, in which Mother stated that "she was in Birmingham, Alabama trying to get her meds out of her car that has been impounded." On January 14, 2023, Green received an email from Mother from the same email address stating Mother had an "opportunity to return to Houston and wanted to schedule to see her daughter but has a warrant for her arrest."

On January 17, 2023, Green emailed Mother at her sister's email address and told her to reach out to Green when she was in Houston so that Green "could make

8

the necessary arrangements to schedule a visit" with Beth.  On January 21, 2023, Mother sent Green a message from Mother's personal email address and told Green "she was back in Texas" and she provided Green with her new phone number.  When Green contacted Mother at that phone number two days later, on January 23, 2023, Mother texted Green that "she was not available to talk as she was completing a psychological evaluation."  On January 25, 2023, Green attempted to contact Mother at the same phone number, but there was no answer.  When Green called Mother again on February 16, 2023, Green learned that the number had been disconnected.  Green did not have any contact with Mother again until she saw Mother at the March 23, 2023 permanency hearing.  At the hearing, Mother told Green she was renting a room in Houston, and she provided Green a new contact number and address.  The record reflects that Mother remained in contact with Green until trial began on May 15, 2023.

### 2.    Participate in Case

The FSP required Mother to "participate in the case by attending court hearings, visitations with her child, and all other [Department] required meetings."

With respect to Mother's obligation to visit with Beth, the record establishes that Mother visited Beth only twice between June 2022 and April 2023, and both visits took place during the month of April 2023.  Green testified that Mother did not visit with Beth until April 14, 2023, ten months after Beth was taken into the

Department's care, and she visited with Beth only one other time before trial. According to Green, Mother brought to the visits lunch, toys, and activities for Beth. Green testified that the visits were appropriate "for the most part" and that Mother and Beth appeared to have a bond. Green testified that Beth and Mother interacted and played during both visits and Mother talked to Beth and "allowed her to kind of do whatever she wanted to do." According to Green, Mother constantly apologized to Beth for leaving her and told Beth that it would not happen again. Although she could not confirm whether Beth recognized Mother because Beth is nonverbal, Green testified that Beth giggled and laughed during the visits, and she appeared relaxed and comfortable with Mother.

When asked if Mother had attempted to schedule any visits with Beth prior to April 2023, Green testified that while Mother had requested virtual visits with Beth, the Department had not been able to schedule such visits because Mother lived out of state during most of the case and Mother's contact information continually changed, making it difficult to arrange virtual visits. According to Green, Mother would call her from various numbers and when Green tried to follow up with Mother, the numbers from which Mother called were no longer in service and Green would have to wait for Mother to contact her again. The record reflects that Mother did not contact Green from September 2022 through January 2023. According to Green,

Mother "never really made herself available until after the March 23rd court hearing where she stated that she was now in Houston."

With respect to Mother's obligation to participate in court proceedings in Beth's case, the Permanency Report reflects Mother did not attend the July 13, 2022 initial permanency conference, the August 25, 2022 status hearing, and the January 3, 2023 first permanency hearing. The first court proceeding Mother participated in was the second permanency hearing held on March 23, 2023.

Green confirmed that Mother told her she left Texas after Beth was taken into care in June 2022 to visit her other daughter who lived in California ("Victoria"). Victoria, who was three years old at the time of trial, is Beth's younger half-sister. She lives with her father and paternal grandmother, S.S. ("Sarah"), at Sarah's home near Los Angeles. According to Green, Mother was "trying to kind of, I guess, do both. See that child and kind of take care of this situation here in Texas." Green testified that Mother had also been in Alabama and Louisiana while Beth was in the Department's care and Victoria was never in either state.

### 3.  Proof of Monthly Income

With respect to Mother's obligation to provide Green with proof of her sources of monthly income, Green testified that in April 2023, Mother gave her a "letter from the Social Security Administration verifying" that Mother receives $1,450 per month in disability benefits. The documentation Mother provided

showed that her disability claim was not approved until December 2022. The Department's Permanency Report reflects that Mother was unemployed when Beth was taken into care in June 2022, and in August 2022, Mother informed the Department that she owned a "kitten rescue operation."[3]

Green also testified that between June 2022, when Beth first came into the Department's care, through April 2023, Mother did nothing to benefit Beth—Mother did not visit with Beth, provide monetary assistance for Beth, or send Beth clothes, food, or gifts, including for her birthday or Christmas.

### 4.      Maintain Stable and Safe Housing

With respect to Mother's obligation to maintain stable and safe housing for a minimum of six consecutive months, Green testified that Mother reported living in California in August 2022, but between September 2022 and January 2023, Mother did not provide a verifiable address.

The Permanency Report states that Mother was "believed to be homeless in California" in September 2022, October 2022, and November 2022. The report also reflects that in January 2023, Mother informed Green she was in Alabama and on February 24, 2023, Mother emailed Green that "she was in Louisiana because she

---

[3]    As discussed later in the opinion, Mother testified that she closed her kitten rescue business in Virginia after Beth came into the Department's care, and although she was receiving Social Security disability payments, she was able to work and had "applied at several jobs."

had just gotten out of jail."[4]  Green testified that "at one point [Mother claimed to have been] staying a few days with her father in Louisiana."  The next time Green saw Mother was at the March 23, 2023 hearing.

In April 2023 Mother gave Green a copy of a lease for a rental property in Houston, Texas.  The lease period commenced on May 1, 2023, two weeks before trial began on May 15, 2023.[5]  Green testified that she did not have any evidence indicating Mother had maintained safe and stable housing during the pendency of the case prior to May 1, 2023.

### 5.	Refrain from Criminal Activity, Not Incur Additional Charges

The FSP also required Mother to refrain from criminal activities.  When asked if there was any evidence that Mother had engaged in criminal activity while the case was pending, Green testified that Mother was charged with assault in November 2022.  While the charge was dismissed, Green testified it was still evidence that Mother had been "engaging in a behavior . . . that led to her being charged."

In April 2023, Green talked to Mother about the assault charge and Mother claimed the charge was "bogus" and she denied any wrongdoing.  Green's Permanency Report reflects that she received an email from Mother on January 14,

---

[4]	Green testified that Mother told her in February 2023 that she was in Alabama.

[5]	The trial was conducted on May 15, 2023 and May 31, 2023.  According to the record, Green testified on May 15, 2023.  Green testified that Mother provided proof of stable housing for "almost a month" and "nearly 30 days because the lease that she sent to me was initiated May 1st of 2023."

2023, stating Mother "had an opportunity to return to Houston and wanted to schedule to see her daughter but has a warrant for her arrest."[6]  On February 24, 2023, Mother told Green she was in Louisiana because she had just gotten out of jail.[7]  Green did not know if any criminal charges were filed against Mother in Louisiana.

### 6.    Substance Abuse and Psychosocial Assessments

Green testified that the FSP required Mother to submit to drug testing and take substance abuse and psychosocial assessments and follow the assessments' recommendations. Green asked Mother to take a hair and urine drug test on April 20, 2023.  Mother provided a urine sample, but she refused to provide a hair sample even though she knew the Department would treat her refusal to provide a sample as an automatic positive.  Green testified that Mother completed the required substance abuse assessment in April 2023, and the assessment did not make any further recommendations.

Green testified that Mother participated in a psychosocial assessment after she returned to Houston and the assessment recommended that Mother have a psychological assessment, as well.  In April 2023, after receiving the results of

---

[6]    Mother testified at trial that a second warrant was issued for her arrest after Beth was taken into the Department's care because she did not make an appearance in her fraud case.

[7]    There is nothing in the record indicating why Mother was arrested in Louisiana.

Mother's psychosocial assessment, Green referred Mother to Butler Psychological for a psychological assessment. Mother told Green that her psychological assessment was scheduled for early May 2023, but Green had not received the written assessment from the psychologist when she testified at trial on May 15, 2023. Although Mother told Green that she had been diagnosed with bipolar disorder, anxiety, and epilepsy, she did not provide Green with medical records supporting such diagnoses.

Green testified that Beth had been living with a foster family since coming into the Department's care and the foster family was meeting all of Beth's needs. Beth's foster parents enrolled her in a special needs daycare program that provided her with a highly structured curriculum and activities. She also received speech and occupational therapy once a week at her daycare. According to Green, Beth was making "great progress" and "thriving" in her foster home due to the speech therapy she received at daycare and the "very stable and predictive schedule" her foster family provided. Green testified that Beth had made "great strides in her meeting some social milestones" since coming into care. According to Green, Beth's sleeping habits had improved significantly, she started playing with other children, as opposed to playing alongside them, she was better at making eye contact and responding to people, and she was able to make noises and say one or two words.

Although Beth's current foster placement is not adoptive, her foster parents are willing to provide long-term care for Beth until a permanent placement is found.

With respect to a permanent placement for Beth, Green testified that Sarah, Victoria's grandmother, had intervened in the case and was seeking conservatorship of Beth. Although the Department had identified Sarah as an adoptive placement, it was not requesting that Beth be placed with Sarah at trial because there was "an [Interstate Compact on the Placement of Children ("ICPC")] underway that has not been completed."[8]

When asked if she had any concerns about how Beth came into the Department's care, Green testified that although Mother told the Department that there was no one who could take care of Beth after she was arrested, Green determined that "someone could have taken the child for the few hours that [Mother] was actually detained." Green further testified that she was concerned because Mother had "demonstrated throughout this child's life [a] pretty much nomadic lifestyle" and "wherever she decided to go she would take the child." Green noted that Sarah "had to [travel to where Mother was living to pick up Beth] due to, I guess,

---

[8] The ICPC is a uniform law that has been adopted in all fifty states, including Texas, that governs the placement of children across state lines. *In re C.R.-A.A.*, 521 S.W.3d 893, 901 (Tex. App.—San Antonio 2017, no pet.). The purpose of the ICPC is to "facilitate interstate child welfare relations and protect the children involved in adoptions that take place across state lines." *In re A.M.*, No. 14-23-00415-CV, 2023 WL 7206735, at *3 n.3 (Tex. App.—Houston [14th Dist.] Nov. 2, 2023, no pet. h.) (mem. op.); *see also* TEX. FAM. CODE § 162.102, art. I.

the lifestyle that [Mother] was leading or living, breaking down and her not being able to meet the child's needs." Green testified that Mother had left Beth in Sarah's care on numerous occasions.

Green testified that Mother also had a finding of neglect regarding Beth, as well as an April 23, 2019 "reason to believe" finding in California. Beth was approximately two-months old at the time. When asked if Mother had ever physically harmed Beth, Green testified that she was not aware of Mother ever physically harming Beth. Green testified that the Department had also received a referral for sexual abuse of Beth on May 22, 2022. The Department learned the alleged perpetrator was a friend of someone Mother knew, but they were not able to follow up with that individual to investigate further.

Green testified the Department was requesting that Mother's parental rights to Beth be terminated pursuant to Subsection O because Mother had not completed her FSP. The Department also requested to be appointed as Beth's sole managing conservator, with the option to place Beth with Sarah once the ICPC is approved.

## B. Allyson Buckner

Beth's Child Advocate guardian ad litem, Allyson Buckner, testified she was assigned to Beth's case one month after Beth was taken into the Department's care. When asked if she had been in contact with Beth's biological parents, Buckner testified that Beth's father was unknown, and she did not have contact with Mother

until Mother made her first court appearance in the case in March 2023. She spoke to Mother several times after the hearing. Buckner testified she had previously attempted to contact Mother using the email addresses and phone numbers she received from Green but most of the phone numbers were disconnected by the time she used them, and she received no response from the email addresses.

Buckner testified that she met with Beth many times. She also met with Green, Beth's attorney ad litem, Beth's foster parents, and the staff at Beth's daycare. According to Buckner, Beth had made tremendous progress since coming into care in June 2022. Buckner testified that when she first met Beth, she "wouldn't really acknowledge me or interact with people coming into the home," but by the time of trial, Beth, who is autistic and nonverbal, is able to communicate with others by using her facial expressions and Buckner can tell that Beth recognizes her. Beth is also doing better at regulating her emotions and she plays with other children at daycare, whereas she had not before.

Buckner testified that Beth's foster parents enrolled her in a special needs daycare where Beth receives occupational and speech therapy once a week to address the effects of her autism. According to Buckner, Beth's speech therapy focuses on teaching Beth how to communicate nonverbally, including by using sign language. Buckner testified that while Beth might learn to speak some words, she will likely never "have a full vocabulary, like full speech." Beth may, however, get

to the point where she can accurately communicate her needs through sign language. According to Buckner, Beth "definitely [is] going to need continued speech therapy, probably for a long time." She testified that Beth was eligible to receive continuing services once she transitions to public school.

Buckner testified that Beth needs an attentive caregiver who can provide her with "24/7 kind of monitoring" and assist her with the speech and occupational needs she will likely need into adulthood. According to Buckner, Beth needs "a caregiver that is going to have the time and the patience to be able to manage . . . her special needs that are going to be ongoing."

Buckner testified that Beth "seems to really have bonded" with her foster parents. At the beginning of the suit, the child was "kind of withdrawn to herself," but since February or March 2023, Buckner noticed Beth showing affection and more emotion. The first time Buckner remembered seeing Beth show affection or emotion was when Beth hugged her foster father. Buckner testified that Beth's foster family was providing her with excellent care, and it was in Beth's best interest to remain with her foster family until the Department finds a permanent placement for her.

With respect to Mother, Buckner testified she understood that Mother had not been in contact with Beth until after the March 2023 hearing. Buckner observed a visit between Mother and Beth two weeks before trial began on May 15, 2023.

19

According to Buckner, the visit was appropriate, and Mother brought snacks and played with Beth while she was there. Buckner, however, was unsure if Beth understood the purpose of the visit and Buckner could not offer an opinion regarding whether Mother and Beth were bonded because Beth was nonverbal, and she did not display any emotion at the end of the visit. Buckner did not know whether Beth had received speech therapy or other services prior to coming into the Department's care, and she had no reason to believe that Mother had been unaware of Beth's case until a few months ago.

Buckner testified that Child Advocates was concerned about Mother's unstable living situation, drug use, and criminal activities. According to Buckner, drug use was a concern in this case because although Mother's urine test was negative for drugs, Mother had refused to submit a hair sample for testing. With respect to Mother's criminal activity, Buckner testified that although Mother's November 2022 assault case was dismissed and she received a deferred adjudication on the fraud case, "deferred adjudication doesn't mean that she's innocent." Buckner is also concerned about the instability of Mother's living situation because "consistency and a schedule is very important in [Beth's] everyday well-being." According to Buckner, Mother seems to "move quite a bit from place to place" and a child with special needs like Beth does not "do well in having to adapt to different environments."

20

With respect to Mother's FSP, Buckner testified that Mother had not shown proof she had maintained a safe and stable living situation for at least six months because Mother had only obtained a lease within the last month or so. Buckner testified that Mother told her she has been diagnosed with bipolar disorder and ADHD and takes medication. Buckner testified it was her understanding that Mother had completed a mental health evaluation within the last month or so.

With respect to Beth's future placement, Buckner testified that Mother had named her sister and Sarah as possible placements for Beth, and Beth's maternal grandmother had also been considered as a possible placement for the child. Buckner testified she had not had an opportunity to talk to Mother's sister and Beth's maternal grandmother was unwilling or unable to care for Beth.

Buckner testified that Sarah's home was the only viable permanent placement and an ICPC for Sarah was in process and almost completed. However, Child Advocates could not recommend that Beth be placed with Sarah at that time because they had not visited Sarah's home and the ICPC was incomplete. Buckner testified that she had not been able to get in contact with Sarah. Buckner admitted that it is difficult to locate adoptive placements for children with autism and confirmed that the Department had not conducted a "legal risk broadcast" to locate such placement.[9]

---

[9] A legal-risk placement is "the placement of a child into an adoptive home prior to a final order terminating parental rights." *In re N.F.*, No. 07-18-00104-CV, 2018 WL 3653545, at *2 n.4 (Tex. App.—Amarillo Aug. 1, 2018, pet. denied) (mem. op.).

21

Buckner testified that Child Advocates recommended Beth remain in her current foster placement until a permanent placement is identified and they requested that Mother's parental rights be terminated pursuant to Subsections (E), (O), and (N). According to Buckner, Mother's absence from the case for the first six to seven months and her criminal involvement supported Child Advocate's request to terminate Mother's rights under Subsection (E).[10]

## C.    Sarah

Sarah, who is not biologically related to Beth, testified that she lives in California with her adult son and her son's three-year-old daughter, Victoria. Victoria is Beth's younger half-sister, and she has lived with Sarah since birth.

Sarah testified that Mother tested positive for marijuana when Beth was born, resulting in California Child Protective Services becoming involved. Sarah testified that Beth and Mother moved into her home when Beth was two months old, and that this living arrangement was the result of an agreement between Mother and the California CPS worker handling the case. Mother and Beth lived with Sarah until

---

[10]    Although the trial court terminated Mother's rights exclusively under Section 161.001(b)(1)(O), the Family Code also authorizes a trial court to order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

22

they moved to Texas in September 2020, approximately eighteen months later.[11] According to Sarah, Mother and Beth lived in Houston for four to six months before moving to Virginia. Sarah testified that she paid for Mother's and Beth's heat and utilities during part of the time they lived in Virginia.

Sarah testified that after Mother and Beth moved out of her home in September 2020, Beth moved back in with her on three separate occasions. The first time was in February 2021, when Sarah traveled to Houston to pick up Beth and she took Beth to her home in California for a month. Later that same year, Sarah traveled to Virginia to pick up Beth and Beth stayed with her in California for a month. Sarah picked Beth up again from Virginia in December 2021. This third time Beth lived with Sarah for approximately five months.

On March 30, 2022, Mother came to California to pick up Beth from Sarah's home. Mother, who had previously provided for Beth when she and Beth lived with Sarah in California, did not provide any monetary assistance to Sarah to care for Beth during the seven months Beth lived with Sarah.

Sarah testified she had spoken to Mother many times about Beth's need for stability and she would get "different responses [from Mother] at different times." According to Sarah, Mother would agree that it was a good idea and "come up with

---

[11] Mother testified that she and Beth first lived in Mother's apartment in Los Angeles before they moved into Sarah's home.

23

a plan of permanency but then, a month later, change her mind." Other times, Mother

> would just get angry and tell me that I just – that it's not my place to tell her that she can't be a good mother because her – because she's poor and I would tell her, I never said that. It's because you keep moving around and I didn't call you a bad parent. I'm saying she needs stability and she's not getting it.

Sarah testified that Mother was "unstable," and she tried to convince Mother to leave Beth with her in California when Mother visited in March 2022. Although Mother initially agreed to leave Beth with Sarah, Mother changed her mind by the next morning. According to Sarah, Mother left Sarah's home with Beth in March 2022, and she never saw Mother again. Beth was taken into the Department's care approximately two months later.

In August 2022, Sarah learned that Beth was in the Department's care, and she hired an attorney to represent her in the proceeding. Sarah, who had kept the same cell phone for ten years, testified she had stayed in contact with her attorney and the Department, and she was not aware that Buckner had been trying to reach her. Sarah testified she was participating in the ICPC process to get Beth placed in her home. Sarah stated that she had finished all the required classes except for CPR, and she had taken "steps to become like a foster home." Sarah testified that she thought it was important for Beth to be with her sister Victoria and "have some

stability and some permanency" and she is willing to provide Beth with stability and permanency should Mother's parental rights be terminated.

Although Mother had attempted to contact Sarah several times during the past year, Sarah did not answer the phone or respond to Mother's text messages. Sarah testified that she does not "answer my phone because of [Mother] attempting to contact me repeatedly from different numbers." Sarah testified that she does not like the "harassment," and she is "afraid to answer any calls that [she does not] recognize because of this." When asked how Mother behaves when she calls, Sarah testified that she had not "been on the phone with [Mother] in over a year, but [she has] several messages and texts that are not very nice" and "[s]ome of them are threatening." Sarah further testified:

> [Mother] will go from saying, oh, I don't know why you guys are mad at me. You guys are my family. And then, if she gets no response, she'll talk about how she hates to do this and – it's just really confusing, you know. It's like threatening messages but she never really says what she's going to do. They're just angry, sometimes not understandable messages, but most of them are in text form.

According to Sarah, Mother's threats were mostly verbal. Sarah testified that it had been almost a year since she had last spoken to Mother.

Sarah testified that in late 2022, Mother texted her that she was homeless in Los Angeles, in an "unsafe situation," and that "basically…all of her problems" were Sarah's fault. When asked if Mother told her she was living out of her car within

25

the past two years, Sarah testified Mother was "constantly [] in her car travelling to different cities," but she did not recall Mother claiming to be living out of her car.

Sarah testified that although Beth appeared to be healthy and fed when she picked Beth up in Texas and Virginia, she was still concerned for Beth when she was with Mother because, in addition to the lack of stability in Beth's life, Mother admitted to Sarah that she had used marijuana and methamphetamine since moving out of Sarah's home in September 2020, and Mother associated with drug addicts and homeless people. Sarah testified she was concerned about Beth because "it's not healthy for the child to be around drug use or with that type of lifestyle."

Sarah testified that she spoke to Mother repeatedly about getting Beth an autism evaluation "so that we could get [Beth] the help that she needed," but Mother never had Beth evaluated or gave Sarah permission to have Beth evaluated. According to Sarah, Beth, who was diagnosed with autism spectrum disorder in July 2022, did not "show signs of autism except maybe a slight speech delay" when she was living with Sarah in California. Sarah testified that Beth would make eye contact, interact with people, and attempt to speak.

With respect to Victoria, Sarah testified that Victoria does not know Mother and had not seen Mother since March 30, 2021. Sarah testified that Mother had given Victoria "little gifts a couple of times," but she had never provided any monetary assistance or done anything to help support Victoria. Sarah testified that

Mother and her son, Victoria's father, were never married, and there are no court orders regarding Victoria's conservatorship. When asked if Mother had any other children, Sarah testified that she thought Mother had an "18-year-old child that was adopted at one year old or something."

Mother told Sarah that she had been diagnosed with ADHD, bipolar disorder, depression, and schizophrenia. According to Sarah, Mother was seeing a psychiatrist when she was in California, and she took medication.

## D. Mother

Mother was arrested on June 10, 2022 on an outstanding warrant for fraud. Mother testified that Beth was taken into the Department's care at that time because Mother did not have anyone to care for Beth while she was being detained. On April 21, 2023, Mother pleaded guilty to the charged offense and she was placed on deferred adjudication community service for two years. The underlying offense occurred on June 24, 2021, approximately a year before Mother was arrested and Beth was removed from her care.[12] Mother and Beth were living in Houston at the time of Mother's arrest, having moved from California, where they had been living with Sarah.

---

[12]    Mother confirmed she had "picked up" the charge in 2021, and that a warrant had been issued for her arrest "for not appearing at [her] court date."

27

Mother testified that when Beth was eighteen months old, they moved to Houston from California. Mother testified she was in Houston only for "a couple of months because . . . I didn't want to live with a bunch of other people." After living in Houston for a few months, Mother "wanted to live alone with [Beth] and so [they] moved to Virginia to a two-bedroom house," where they lived for approximately one year.[13] Mother paid for Sarah to fly to Virginia to retrieve Beth after Mother was injured in a car accident because she was unable to care for Beth. Mother testified that she drove to California and picked Beth up in March 2022, and they returned to Virginia. According to Mother, she and Beth were in the process of moving from Virginia to California when Mother was arrested in Houston in June 2022.

Mother testified she believed she had completed all the tasks required by her FSP and that she had done her best to maintain contact with the Department while Beth's case was pending. When asked why she had not been in contact with the Department between June 2022 and March 2023, Mother testified that she was not living in Houston, and she was in the process of moving from Virginia to California. Mother testified that she had several different telephone numbers while Beth was in the Department's care because one of her phones was stolen and she was "dealing with a hack" that required her to go "through several phones." According to Mother,

---

[13]     Later in her testimony, Mother testified she moved to Virginia for her "job" because she had her "own business rescuing animals."

28

her phone had acquired a virus through her Gmail account "that will go through your emails and delete your phone."

Mother testified that she did not appear for the first three court dates because her previous lawyer did not tell her about the court dates until the day before and Mother indicated that the "links" her attorney provided to her did not work. When asked how she learned of the March 23, 2023 hearing date, Mother testified:

> I didn't know where my kid was for a very long time. And I literally had to come up to the court – I came to the courthouse during the days I knew they were going to have like find out where my kid was. They wouldn't give me any information without an ID. I didn't have a Texas ID. Like it took me a very long time to figure out how to get her back in my care. Like it's a process to move from one state to another and uproot your whole life.

When asked if she filed a statement of inability to afford payment in this case on July 19, 2022, Mother testified that she did not come to court, and she did not remember filling it out. The statement of inability to afford payment reflects that Mother signed it in California on July 18, 2022. The record also includes a child caregiver resource form Mother signed on July 19, 2022 that names Sarah and Victoria's father as possible caregivers for Beth.

With respect to her visits with Beth, Mother testified that she did not see Beth between June 10, 2022 and March 2023, because no one would tell her where Beth was located. She testified that Malbrough, the caseworker to whom she spoke at the jail after she was arrested in June 2022, did not tell her that the Department was

taking Beth into care, and Mother was "unaware of where [Beth] was going." But when pressed, Mother admitted she knew Beth had gone into the Department's custody. Mother testified she called Malbrough to find Beth when she was released from jail, but that Malbrough blocked her calls.

Mother testified that she went to the CPS office in Los Angeles to find Beth because she had "attempted to notify everyone [she] could to try to find [Beth] before that in the Houston area. But no one could tell me where she was because it was sensitive information." Mother, however, also testified that "during this case," she requested visits with Beth from "the CPS caseworker" and she was told she could not have a virtual visit. Mother testified that she asked Green to provide her with virtual visitation with Beth, but that she was not allowed to because the "the Court denied it." She testified:

> I was – I was extremely upset the first few months of this case because I don't know what I did wrong. So it's my fault that I did not attend court and I apologize for that. It's very hard to just not have your child whenever you've had her her whole life.

After she returned to Houston in February or March 2023, Mother had two visits with Beth. Mother, who characterized the visits as "great," testified:

> I mean she loves me. She saw me again. She didn't act any way – in any way strange to me. Even whenever I was getting up to get ready to leave, stepped on my feet. She didn't want me to leave, so she kept staying on top of my feet so that I wouldn't walk away.

She testified that she "tried multiple times since the last visit to schedule another visitation" with Beth but the Department had not scheduled any further visits.

With respect to whether she has stable income as required by her FSP, Mother testified she receives $1,450 each month from Social Security because of her epilepsy diagnosis, plus $650 in food stamps and other government benefits, and she believes her Social Security income is enough to support her and Beth. Mother acknowledged she had not provided any resources for Victoria or Beth during the past year. She testified she wanted to provide for Victoria and Beth the last year, but she was not able to do so. Mother testified she did not have another source of income because she was a single parent and Beth required around-the-clock care. She testified that she had her own animal rescue business in Virginia but that she closed the business after Beth was removed from her care. Mother testified she was unemployed but she was "looking for employment now" in Houston, and she was in the process of buying a car. Mother also testified that she was able to work, despite having epilepsy.

When asked if she had stable housing as required by her FSP, Mother testified that she had a one-year lease for a two-bedroom rental property in Houston and she believed that she could provide Beth with a safe and stable environment. Mother testified she had asked Green to look at the apartment, but Green had not done so. Mother testified that she had lived in an apartment in Los Angeles for many years,

31

but she stopped paying for it, and she lived in a hostel in Los Angeles for a month before she moved to Houston in early 2023. Mother testified that she moved to Houston because the Department would not pay for services in California, and she wanted to be reunified with Beth. Mother stated that she always had a place to live, and she denied that she was ever homeless. She also denied ever living in Alabama or Louisiana and testified that she had only lived in California, Virginia, and Texas. She did not think her frequent moves were harmful to Beth.

Mother denied telling Green on January 11, 2023, that she was living in her car in Alabama. According to Mother, she and Beth had parked at the airport in Alabama and flew to Houston to visit Mother's sister a few weeks before Beth was taken into care. Mother testified her car was impounded because she left it parked at the airport for too long and she returned to Alabama in January 2023 to retrieve her car from the impound because her medication was still inside.

Regarding her alleged criminal conduct, Mother testified that the fraud charge occurred a year before Beth was taken into the Department's care. Mother also denied assaulting anyone and testified that the assault charge from November 2022 was dismissed because the alleged assault "did not happen." Mother admitted, however, that she failed to make a court appearance in her criminal fraud case while Beth's case was pending because she had moved back to California and a second warrant had been issued for her arrest.

32

With respect to the other requirements in the FSP, Mother testified that she completed parenting classes that were not required by her FSP, including a Parent Education and Family Stability course and Putting Kids First, but the Department refused to accept her certificates. She took a psychosocial assessment, which did not result in any recommendations. Mother testified that she completed the substance abuse assessment, which did not result in any recommendations, and she denied using drugs or alcohol except for marijuana, which is legal in California.

Mother testified that she was diagnosed with epilepsy, bipolar disorder, ADHD, and anxiety. She is taking medication and seeing a psychiatrist every two weeks. Mother denied ever being diagnosed with schizophrenia. Mother testified that she had been seeing a psychiatrist in California once a month and the last time she saw that doctor was in February 2023.[14]

Mother testified she had not enrolled Beth in speech therapy. She had planned to enroll her when they were living in California after a doctor there told her that Beth had a speech delay and needed to go to speech therapy. The doctor told Mother that Beth might be autistic, but that Beth could not be tested for autism until she was older. Mother testified that she would continue Beth in speech and occupational therapy if Beth is returned to her care.

---

[14]    Mother, however, also testified that she was in Alabama in January 2023, Louisiana in February 2023, and she moved to Houston in February 2023.

Mother testified that Beth was always healthy and taken care of when she lived with her, and she denied ever hurting Beth. She also denied threatening Sarah and testified that the "only []threat that I have made towards her is that I would like – I want to see [Victoria] and I will see [Victoria] whether or not we have to go to court, but there was no physical threat to harm her or emotional attack." She testified she had not taken any legal action in California as it concerns Victoria.

Mother testified that Child Protective Services in California opened a case after Mother tested positive for marijuana when Beth was born. According to Mother, the marijuana had been medically prescribed to treat her seizures and the case was closed in May 2019. She denied that CPS asked her to move in with Sarah and claimed that she and Beth moved in with Sarah because she was pregnant with Victoria. Mother does not believe her marijuana use while pregnant harmed Beth.

Mother testified that she was aware of sexual abuse allegations regarding Beth and clarified it was she who brought Beth to the hospital. According to Mother, it was subsequently determined that Beth was not abused. Mother testified that she and Beth had stayed at a hotel in Houston off the Northwest Freeway for a few weeks before Mother was arrested on June 10, 2022, and Mother stayed at the hotel for

three months after she was released from jail. Mother testified she was not aware of anyone trying to serve her in this case at the hotel at which she was staying.[15]

## E.    Beth's Foster Father

Beth's foster father testified that Beth was placed in his home when the case began. When asked to describe any changes he noticed in Beth after she came into his care, he testified that Beth had made significant progress developmentally including making increased eye contact and she was sleeping better. She was also engaged in potty training whereas before she did "did not want to have anything to do with it." With respect to her communication skills, Beth had begun using sign language and other nonverbal forms of communication, which she was not doing when she first came to her foster home. She was also trying to say her name and repeating sounds.

With respect to her behavior, Beth's foster father testified that Beth was experiencing far fewer tantrums and he believed it was because "she feels like she's heard, that she can communicate and that . . . we understand her." She understood redirection, listened to simple commands, and was "definitely more used to people." When Beth initially started living with them, she did not acknowledge her foster

---

[15]    Mother told Green on August 5, 2022 that she was in California, which was almost two months after Mother was arrested in Houston.

parents, even when they called her name. At the time of trial, however, she sat with her foster family and was "just showing that connectivity."

Beth's foster father testified that he and his family were meeting all of Beth's physical, emotional, and developmental needs and although they were not able to adopt her, they were willing to remain a long-term placement for her until her permanent home could be found. He also testified that Beth's daycare was meeting all of her special needs and the occupational and speech therapy she received there were essential for her continued development.

After hearing oral arguments, the trial court rendered judgment terminating Mother's parental rights to Beth pursuant to Section 161.001(b)(1)(O) of the Texas Family Code and naming the Department as Beth's sole managing conservator.[16] The trial court signed a decree memorializing the judgment rendered from the bench.

Mother filed a timely appeal.

## Termination of Mother's Parental Rights

In her first and second issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings she (1) failed to comply with her FSP, and (2) that termination of her parental rights is in Beth's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(O).

---

[16] The decree also terminated the parental rights of Beth's unknown father.

## A.    Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted); *see also In re R.J.G.*, No. 22-0451, 2023 WL 8655998, at *1 (Tex. Dec. 15, 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children.").  Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20.

In a case to terminate parental rights under Texas Family Code Section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying

termination and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we examine all evidence in the light most favorable to the finding, assuming the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266. We must also disregard all evidence that the factfinder could have reasonably disbelieved or found not to be credible. *Id.* But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that

evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

When conducing a factual sufficiency review in a termination case, we must consider the entire record. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *In re J.F.C.*, 96 S.W.3d at 266. We assume "that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266). Unlike a legal sufficiency review, when assessing the factual sufficiency of the evidence we cannot disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266); *see also In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) ("The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered."). Rather, we must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under both legal and factual sufficiency standards, the factfinder trial court is sole arbiter of a witness' credibility

and demeanor and the weight of the evidence. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## B. Predicate Findings

In her first issue, Mother argues there is legally and factually insufficient evidence supporting the trial court's finding that she failed to comply with the provisions of her FSP. She further argues that her failure to "participate in the case by attending court hearings, visitations with her child, and all other [Department] required meetings" cannot support termination of her parental rights under Section 161.001(b)(1)(O) because she made a good faith effort to comply with this requirement and the reasons for her non-participation in the beginning of this case "were not attributable to any fault of her own." *See* TEX. FAM. CODE § 161.001(b)(1)(O), (d).

### 1. Applicable Law – Section 161.001(b)(1)(O)

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that (1) the parent has engaged in at least one statutory predicate act and (2) termination is in the best interest of the child. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019); *see* TEX. FAM. CODE § 161.001(b).

Under Section 161.001(b)(1)(O), a parent's rights may be terminated if clear and convincing evidence establishes the parent failed to comply with the provisions of a court order that specifically sets forth the actions necessary for the parent to

40

obtain return of a child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months due to removal of the child from the parent for abuse or neglect of the child. *See* TEX. FAM. CODE § 161.001(b)(1)(O). A parent's failure to complete a specific, material requirement of a family service plan can be sufficient to support termination under Subsection (O). *See In re J.W.*, 645 S.W.3d 726, 742 (Tex. 2022) (affirming termination of parent's rights when "a reasonable juror could have formed a firm belief or conviction that Father failed to maintain a safe and stable home environment and thus failed to comply with the service plan").

The Texas Supreme Court's recent opinion in *In re R.J.G.*, No. 22-0451, 2023 WL 8655998 (Tex. Dec. 15, 2023) clarified that "strict compliance with every detail of a service plan is not always required to avoid termination under (O)." *Id.* at *7. The court explained that a parent's failure to comply with a specific plan provision does not necessitate termination of parental rights. *Id.* at *6 (stating "termination is not automatic or required, even if the Department properly proves a parent failed to comply with a specific plan provision"). Rather, trial courts bear the ultimate "responsibility for determining whether that finding supports termination." *Id.*

The termination of a parent's rights under Subsection (O) is "warranted only for violations of requirements that are 'specifically established' in a service plan." *Id.* at *7 (quoting TEX. FAM. CODE § 161.001(b)(1)(O) (requiring evidence parent

41

failed to comply with "provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child")). As the Supreme Court explained, evidence is insufficient to support a finding a parent failed to comply with the provisions of a family service plan if the finding is "premised on a plan requirement that is unwritten, and thus supplied only by the caseworker's oral testimony, or on one that is written but vague." *Id.* at *1. Thus, termination of a parent's rights under Subsection (O) is "not warranted when a parent participates as the plan requires and the Department waits until trial to reveal that it was measuring performance against a previously undisclosed requirement." *Id.* at *7.

A parent's noncompliance with a "specifically established" requirement in the family service plan, however, does not necessarily support termination of the parent's rights under Subsection (O). As the court explained in *In re R.J.G.*,

> [E]ven if the Department proves by clear and convincing evidence that a parent failed to comply with a requirement "specifically established" in the written plan, that requirement may be so trivial and immaterial, considering the totality of what the plan requires, that the parent's noncompliance does not justify termination. A trial court should not reflexively order termination when the evidence demonstrates noncompliance with a plan requirement. Instead, the trial court should consider whether the nature and degree of the asserted noncompliance justifies termination under the totality of the circumstances.

*Id.* at *2; *see also id.* at *6 (stating trial courts bear ultimate "responsibility for determining whether that finding supports termination"). Thus, a parent's failure to comply with a "trivial and immaterial," "bureaucratic or mechanical box-checking"

42

requirement of a family service plan also does not support termination under Section 161.001(b)(1)(O).  *Id.* at *6.  Rather, the evidence must demonstrate that the parent failed to comply with a "specifically established" provision of the service plan that is material considering the plan's requirements overall.  *See id.*

The Family Code establishes a single affirmative defense to termination for failure to comply with a court order under Subsection (O):

> A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
> (1)    the parent was unable to comply with specific provisions of the court order; and
>
> (2)    the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

TEX. FAM. CODE § 161.001(d).  Under Section 161.001(d), the parent must prove by a preponderance of the evidence that she was unable to comply with the court-ordered service plan, she made a good faith effort to comply with the order, and her failure to comply is not attributable to any fault of her own.  *In re L.E.R.*, 650 S.W.3d 771, 788 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *see also In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *16 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) ("Mother had the burden to prove by a preponderance of the evidence that she was unable to comply with her FSP, she made a good faith effort

43

to comply with her FSP, and her failure to comply with the FSP was not attributable to any fault of her own.").

## 2. Analysis

Mother argues there is legally and factually insufficient evidence supporting the trial court's finding that she failed to comply with her FSP because (1) Mother provided Green with a one-year lease for an apartment in Houston, thus demonstrating her ability to maintain safe and stable housing for a minimum of six consecutive months; (2) she provided Green with a letter establishing that she receives $1,450 each month from Social Security, thus demonstrating she has stable income;[17] (3) she participated in and successfully completed a psychosocial assessment;[18] (4) there is no evidence she engaged in criminal activity while the case was pending because although she was arrested and charged with assault in November 2022, the charge was dismissed; (5) she completed a substance abuse assessment and, because the assessment did not recommend that she submit to further drug testing, her refusal to provide a hair follicle sample did not violate the FSP; (6) there is no evidence Mother failed to comply with the FSP's requirement that she "maintain a positive support system that is safe, crime-free, drug/alcohol

---

[17]    The Department does not dispute that Mother complied with her obligation to provide the Department with proof of stable income.

[18]    The Department does not appear to dispute that Mother complied with her obligation to participate in and successfully complete a psychosocial assessment.

44

free;"[19] (7) she maintained contact with Green while the case was pending; and (8) she completed parenting classes that were not required by the FSP.

Mother acknowledges that she did not comply with the FSP's requirement that she attend court hearings, visitations with Beth, and meetings with the Department. She argues, however, that her non-participation in the beginning of the case is not attributable to any fault of her own and thus cannot support termination of her parental rights under Subsection (O). *See* TEX. FAM. CODE § 161.001(d).

In *In re R.J.G.*, the Supreme Court held there was legally insufficient evidence supporting termination of the mother's parental rights under Subsection (O) based on evidence the mother failed to comply with a requirement not expressly stated in her family service plan. The court explained the mother had made "sustained efforts to complete the plan and demonstrate[d] her desire and ability to parent, such as by seeking counseling, staying drug-free, visiting with her children, and maintaining employment and stable housing." 2023 WL 8655998, at *4. The court held that the mother's failure to comply with an express requirement of her plan "to provide the Department a certificate [of completion] demonstrating what the caseworker concedes she knew—[was] too trivial and immaterial, in light of the degree of [the

---

[19] The Department does not appear to dispute that there is no evidence Mother failed to comply with her FSP's requirement that she "maintain a positive support system that is safe, crime-free, drug/alcohol free."

mother's] compliance with the plan's material requirements, to support termination under (O). *Id.* at *7–9.

The Department argues that *In re R.J.G.* is distinguishable from the present case because unlike the parent in *In re R.J.G.*, Mother "failed to engage in any meaningful effort to comply with the terms of her plan" until "the very end of the case," and "the evidence of [Mother's] conduct in light of the totality of the goals and tasks set by her family service plan demonstrates she failed in several material respects to comply with the terms of her plan." According to the Department, "Mother's absence from the suit and failure to notify the Department of her whereabouts or provide reliable contact information for nine months until March of 2023" demonstrate she failed to comply with her plan's material and specified requirements to "maintain stable and safe housing for minimum of six months consecutively," "demonstrate that she can provide housing that will protect her child and provide consistency and stability…," "provide the DFPS worker with a current lease along with utility bills to show proof of a safe and structured home environment," and "notify her current caseworker within 24 hours of [a] relocation, and provide new leasing information for the current residence." Because Mother's "family service plan was rightly focused on addressing concerns regarding her instability and inability to provide [Beth] with the stability and care the child

required," the Department argues Mother's failure to comply with these express requirements was neither "trivial" nor "immaterial."[20]

We agree with the Department that *In re R.J.G.* is distinguishable and does not support a finding that the evidence establishing Mother's failure to comply with material terms of her service plan is insufficient.

### a) Maintain Safe and Stable Housing

The housing requirement in Mother's FSP states:

[Mother] will maintain stable and safe housing for a minimum of six months consecutively. She will demonstrate that she can provide housing that will protect her child and provide the consistency and stability that they need. [Mother] will provide the [Department] worker with a current lease along with current utility bills to show proof of a safe and structured home environment. In the event that another occupant moves into [Mother's] current residence, she will provide the current CPS caseworker with the current occupant[']s name, date of birth, social security numbers, and copy(s) of needed identifying information for that person within 48 hours of their occupying the current residence.

[Mother] will allow her DFPS caseworker access to her current residence to verify safety.

If [Mother] moves, she will notify her current caseworker within 24 hours of the relocation, and provide new leasing information for the current residence.

---

[20]    *In re R.J.G.* was issued after the briefing was filed in this appeal. We thus afforded the parties an opportunity to submit supplemental briefing addressing the impact, if any, of *In re R.J.G.* on this appeal. The Department filed a letter brief, arguing *In re R.J.G.* is distinguishable. Mother did not file a supplemental brief addressing *In re R.J.G.*

The record reflects that in April 2023, Mother provided Green with a one-year lease she signed for a two-bedroom apartment in Houston. The lease was to commence on May 1, 2023, two weeks before trial began on May 15, 2023. This lease agreement is the only proof of stable and safe housing Mother provided to Green. Mother, who "concedes she had not resided in this home for a six-month period prior to trial," nevertheless "asserts the term of the lease satisfies the duration requirement." We disagree.

The one-year lease agreement Mother provided to Green reflects Mother's intent to maintain stable and safe housing for a minimum of six consecutive months in the future. But it did not demonstrate, as the FSP required, that Mother had been able to maintain stable and safe housing for a minimum of six consecutive months during the pendency of the case. Mother testified on May 15, 2023. Thus, at the time of trial, Mother had lived at the apartment for only fifteen days. Prior to that time, the evidence reflects Mother moved frequently and had not lived in a single place for the required six-month duration. *See In re J.W.*, 645 S.W.3d at 742 (holding legally sufficient evidence supported termination of parental rights pursuant to Subsection (O) solely because parent failed to maintain safe and stable home environment).

Mother does not appear to argue that her failure to comply with this requirement cannot support termination under Subsection (O) because she made a

48

good faith effort to comply with her FSP, and her failure to comply with the FSP was not attributable to any fault of her own. *See* TEX. FAM. CODE § 161.001(d). To the extent Mother asserted such an affirmative defense, the only evidence that might support it is Mother's testimony that she lived in an apartment in Los Angeles for many years before she moved to Houston in February 2023. But Mother did not provide Green with a lease for her California apartment. The record also reflects that Mother traveled extensively during the pendency of the case. During the eleven months after Beth was removed from her care, evidence reflected Mother lived in a hotel in Houston for three months, she was temporarily homeless in Alabama, she lived in a hostel in Los Angeles for a month, and before that she was in her apartment in Los Angeles. Although Mother disputed being homeless and testified she lived in her Los Angeles apartment for many years, it was within the trial court's province, as the sole arbiter of a witness's credibility, to disbelieve Mother's testimony and conclude, in light of the evidence, that Mother had not produced evidence of stable housing as required by the FSP. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court is sole arbiter of witness's credibility and demeanor).

### b) Maintain Contact with the Department

Mother's FSP required her to "maintain contact" with Green and provide the Department with "all phone numbers, email and back up contact numbers where [Mother] can be reached." Green's testimony and the Permanency Hearing Report,

49

admitted into evidence as Petitioner's Exhibit 9, reflect that Mother did not maintain contact with the Department throughout the duration of Beth's case.

Green testified that her contact with Mother was "sporadic at best." According to Green, Mother called her from "various numbers" while the case was pending, and when Green called Mother at those phone numbers, "they would no longer be in service," and Green "would have to wait for [Mother] to either contact me back or reach out to the last known e-mail address." Green also testified she did not hear from Mother for five months during the eleven months Beth's case was pending.

The Department's Permanency Hearing Report chronicles in greater detail Green's contacts with Mother over the duration of the case. The report reflects that Green and Mother spoke on the phone on August 5, 2023, and Mother told Green that she was in California and she "wanted to know [how] to get her daughter back." Mother also told Green that she had Beth's birth certificate and immunization records. When Green called Mother back at the same number six days later, an unknown male answered the phone and told Green that he had purchased the phone from a female a few days prior. There is no evidence in the record that Mother contacted or attempted to contact the Department again until January 7, 2023, five months later.

On January 7, 2023, Mother emailed Green from her personal email address and asked Green what she needed to do to be reunited with Beth. On January 11, 2023, Green received a message from another email address "stating that [Mother] was residing in her car in Alabama." Mother testified that this second email address belonged to her sister. On January 13, 2023, Green received another message from Mother, who was still using her sister's email address, in which Mother stated that "she was in Birmingham, Alabama trying to get her meds out of her car that has been impounded." On January 14, 2023, Green received an email from Mother from the same email address stating Mother had an "opportunity to return to Houston and wanted to schedule to see her daughter but has a warrant for her arrest."

On January 17, 2023, Green emailed Mother at her sister's email address and told her to reach out to Green when she was in Houston so that Green "could make the necessary arrangements to schedule a visit" with Beth. On January 21, 2023, Mother sent Green a message from Mother's personal email address and told Green "she was back in Texas" and she provided Green with her new phone number. When Green contacted Mother at that phone number on January 23, 2023, Mother texted Green that "she was not available to talk as she was completing a psychological evaluation." On January 25, 2023, Green attempted to contact Mother at the same phone number, but there was no answer. When Green called Mother again on February 16, 2023, Green learned that the number had been disconnected. Green

51

did not have any contact with Mother again until she saw Mother at the March 23, 2023 permanency hearing.

The evidence thus reflects that Mother, who periodically contacted Green using different phone numbers and email addresses and did not email or call Green from late August 2022 to January 7, 2023, did not maintain contact with the Department during the pendency of the case.

### c) Refrain from Criminal Activities, Incurring Additional Charges, and Abiding by the Terms Regarding her Current Case

The FSP required Mother to refrain from all criminal activities, "not incur additional charges," and "continue to abide by the terms regarding her current case." Mother argues she satisfied the requirement that she refrain from all criminal activities because there is "no evidence [she] committed an assault, or engaged in any criminal conduct, during the pendency of this case."[21] According to Mother, who denied assaulting anyone, the November 2022 assault charge was dismissed because the alleged assault "did not happen." Mother, however, does not address the FSP's requirements that she "not incur additional charges," and "continue to abide by the terms regarding her current case."

---

[21] Mother also argues that "the court denied the agency's request for an (E) finding, encompassing a parent's criminal history and conduct, which would conclusively establish an (O) ground finding. *See In re J.F.G.* 627 S.W.3d, 304, 313–15 (Tex. 2021).

We agree with Mother that there is insufficient evidence she failed to comply with the FSP's requirement that she "refrain from all criminal activities." The record reflects that Mother was arrested and charged with assault in Houston in November 2022, five months after Beth was taken into the Department's care. But Mother testified that the charge was dismissed because the assault "did not happen," and there is nothing in the record refuting her testimony. And while Mother informed Green that "she was in Louisiana because she had just gotten out of jail," there is nothing in the record indicating why Mother was arrested in Louisiana or when the underlying offense leading to her arrest occurred.

But while the dismissed assault charge does not establish Mother engaged in criminal activity during the pendency of the case, it is evidence Mother was charged with a criminal offense while Beth was in the Department's care. Mother also testified that she violated the terms of her release in her fraud case after Beth was taken into care by not appearing for a hearing, resulting in a second warrant for her arrest. The evidence thus reflects that Mother neither refrained from "incur[ring] additional charges," nor "abide[d] by the terms regarding her current case" while Beth was in the Department's care.

### d) Substance Abuse

Mother argues she complied with her FSP's substance abuse requirements because she was only required to take a drug test if her substance abuse assessment

recommended that she be drug tested and "there is no evidence whatsoever that mother used drugs or alcohol during the pendency of this case."

On the contrary, the FSP required Mother to "participate in an initial drug/alcohol test," and "[d]epending upon the outcome of the drug test," Mother "may be asked to complete a substance abuse assessment and follow all recommendations." The FSP further states that "[a]ny refusal of drug/alcohol testing will be considered as testing positive." Green testified that she asked Mother to submit to random drug testing on one occasion and she "referred [Mother] for a hair and [urine analysis]." It is undisputed that although Mother submitted a urine sample, she refused to provide a hair follicle sample for testing. The evidence thus reflects that Mother did not fully participate in an initial drug test as required by her FSP when she refused to provide a hair sample, and under the express terms of her FSP, Mother's refusal to do so is considered a "positive" result.

e)    **Participation in the Case**

The FSP required Mother to "participate in the case by attending court hearings, visitations with her child, and all other [Department] required meetings."

The record reflects that Mother did not attend the July 13, 2022 initial permanency conference, the August 25, 2022 status hearing, and the January 3, 2023 first permanency hearing. The record also reflects that Mother did not visit with Beth until April 2023, ten months after Beth was taken into the Department's care.

54

The requirement that Mother attend court hearings directly affecting Beth and Mother's rights to Beth, and that she visit her young daughter thus fostering their familial relationship, are critical to Mother's reunification with Beth. These are not "trivial or immaterial" requirements for reunification. *See In re R.J.G.*, 2023 WL 8655998, at *9 (stating "single or slight violation of . . material service plan provisions *could* justify termination").

Mother does not dispute that she failed to comply with these material requirements. Rather, relying on Subsection 161.001(d) of the Texas Family Code, Mother argues there is legally and factually insufficient evidence supporting the trial court's termination of her rights under Subsection (O) because she made a good faith effort to participate in Beth's case and the reasons for her non-participation in the beginning of this case "were not attributable to any fault of her own." *See* TEX. FAM. CODE § 161.001(d). With respect to Subsection 161.001(d), the trial court's decree states:

> [Mother] failed to raise a defense based on Texas Family Code §161.001(d) to the court's finding under §161.001(b)(1)(O) of the Family Code; and, even if presented, the court finds that there was no proof by a preponderance of evidence that [Mother]: (1) was unable to comply with specific provisions of a court order; and (2) [Mother] made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of [Mother's].

Subsection 161.001(d) of the Family Code, which creates an affirmative defense to Subsection 161.001(b)(1)(O), states:

A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:

(1) the parent was unable to comply with specific provisions of the court order; and

(2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

TEX. FAM. CODE § 161.001(d); *In re T.S.*, , 2022 WL 4474277, at \*16 ("Mother had the burden to prove by a preponderance of the evidence that she was unable to comply with her FSP, she made a good faith effort to comply with her FSP, and her failure to comply with the FSP was not attributable to any fault of her own.").

The Department argues Mother waived this affirmative defense by failing to raise it in the trial court, and even if she did not waive it, Mother failed to meet her burden to prove this affirmative defense by a preponderance of the evidence. *See In re A.M.*, No. 14-23-00415-CV, 2023 WL 7206735, at \*7 (Tex. App.—Houston [14th Dist.] Nov. 2, 2023, no pet. h.) (mem. op.) (holding father waived Section 161.001(d)'s affirmative defense "because he did not assert the defense in his pleadings or during trial and provided no evidence to support it"); *In re N.B.*, No. 12-22-00236-CV, 2022 WL 16843243, at \*3 (Tex. App.—Tyler Nov. 9, 2022, no pet.) (mem. op.) (stating party waives Section 161.001(d) defense by failing to plead it).

Even assuming, without deciding, that Mother properly preserved this affirmative defense, there is legally and factually sufficient evidence supporting the trial court's findings that Mother did not prove by a preponderance of the evidence that she made a good faith effort to "participate in the case by attending court hearings, visitations with her child, and all other [Department] required meetings," or that her failure to comply was not attributable to any fault of her own.

Mother argues she was unable to attend the July 13, 2022 initial permanency conference, the August 25, 2022 status hearing, and the January 3, 2023 first permanency hearing and visit with Beth before March 2023 because she was an "indigent . . . resident of California" who "was only visiting Houston when the agency initiated this case." Mother, however, testified that she lived in a hotel in Houston for three months after Beth was removed from her care on June 10, 2022. Her absence from the state for most of Beth's case thus does not explain, at a minimum, why Mother did not attend the July 13, 2022 initial permanency conference or why she made no efforts to visit with Beth during those three months immediately following her release from jail in June 2022.

While Green understood Mother had returned to California to see Victoria,[22] Mother also testified that Sarah had not allowed her to see Victoria "for over a year,"

---

[22]  Green, who testified she was not able to contact Mother until August 5, 2022, testified that when she spoke to Mother on August 5, 2022, Mother told her she had moved back to California.

and the last time she saw Victoria prior to trial was in April 2021. The record also reflects that, in addition to traveling to California, Mother also traveled to Louisiana, and Alabama before moving to Houston in February 2023, and there is no evidence that Victoria was ever in those states.

Mother testified that she eventually moved back to Houston in February 2023 because she wanted to be reunited with Beth and she understood the Department would not pay for services in California. Mother, however, does not explain why she was unable to move to Houston earlier, despite knowing that her participation in court proceedings and visits with Beth were requirements for reunification with her daughter. TEX. FAM. CODE § 161.001(d) (requiring parent to prove their "failure to comply with the order is not attributable to any fault of the parent").

Mother's argument that her lack of participation was due in part to the fact that she took a job in Virginia is also not persuasive because while Mother testified that she had an animal rescue business in Virginia, she also testified that she closed the business after Beth was taken into care. Moreover, Mother does not explain how her choice to maintain her California residency and search for employment outside of Texas demonstrate that her failure to participate in Beth's case was not her fault. *Id.*

Although Mother testified that she did not attend the July 13, 2022 hearing or other two court proceedings because her then-attorney did not provide her with the

58

necessary information, Mother also testified she was "extremely upset the first few months of this case because I don't know what I did wrong. So it's my fault that I did not attend court and I apologize for that." As the sole arbiter of a witness' credibility, it was within the trial court's province to disbelieve Mother's testimony that she did not attend the first three court proceedings because her attorney failed to inform her of the proceedings. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court is sole arbiter of witness' credibility and demeanor).

With respect to her obligation to visit with Beth, Mother also argues she requested virtual visits with Beth, but she "was informed by the agency that the court would not allow it." Green testified that while Mother had requested virtual visits with Beth, she was not able to schedule or coordinate such visits with Mother because Mother's contact information regularly changed while the case was pending, making it difficult to schedule the visits. According to Green, Mother would call her from various numbers and when Green tried to follow up with Mother, the numbers from which Mother called were not in service and she would have to wait for Mother to contact her again.

Mother also testified that she was not able to visit Beth between June 10, 2022, and March 2023 because she did not know where Beth was "for a very long time" and no one would tell her Beth's whereabouts. Mother, however, also testified that she knew when the case began in June 2022 that Beth was in the Department's care

59

in Houston, and the record reflects that Mother knew by no later than August 5, 2022 that her FSP required her to visit with Beth, that Green was Beth's caseworker, and that Mother knew how to contact Green, as evidenced by the emails and calls Mother made to Green during the pendency of the case. As the sole arbiter of a witness' credibility, it was within the trial court's province to disbelieve Mother's testimony she was unable to visit with Beth because no one would tell her Beth's whereabouts. *See id.*

We thus conclude there is sufficient evidence supporting the trial court's findings that Mother failed to meet her burden to prove by a preponderance of the evidence that she made a good faith effort to comply with the FSP's requirement that she "participate in the case by attending court hearings, visitations with her child, and all other [Department] required meetings," and that her failure to comply with this requirement was not attributable to any fault of her own. *See In re L.E.R.*, 650 S.W.3d 771, 788 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (holding trial court's findings that mother failed to raise and prove statutory defense under Section 161.001(d) were supported by legally and factually sufficient evidence). Moreover, even if Mother had met her burden to prove by a preponderance of the evidence that she made a good faith effort to comply with this FSP requirement and that her failure to comply was not attributable to any fault of her own, as we have concluded, there is sufficient evidence that Mother failed to comply with the FSP's specific and

60

expressly stated requirements that she maintain stable and safe housing for a minimum of six consecutive months, maintain contact with the Department, not incur additional charges, and comply with the orders in her fraud case. Like Mother's requirement to participate in Beth's case, these FSP requirements were also material provisions given that Beth came into the Department's care after Mother was arrested in June 2022 on an outstanding warrant issued when she failed to appear in a pending criminal case and given Mother's nomadic lifestyle affecting her ability to provide Beth with a life of stability and certainty. *See In re R.J.G.*, 2023 WL 8655998, at *9 (stating "single or slight violation of . . material service plan provisions *could* justify termination").[23]

The record reflects that Mother failed to maintain stable and safe housing and contact with the Department throughout most of Beth's case. These are not isolated instances of non-compliance. Rather, these failures are part of an ongoing and continuous pattern of conduct demonstrating Mother's inability to meet the requirements for reunification with Beth. *In re R.J.G.*, 2023 WL 8655998, at *2

---

[23] Although Mother failed to comply with her requirement to "participate in an initial drug/alcohol test" when she refused to provide a hair sample, her failure to do so, standing alone, does not necessitate termination of her rights given that Mother's drug abuse assessment did not make any further requirements, including additional drug testing. *See In re R.J.G.*, No. 22-0451, 2023 WL 8655998, *2 (Tex. Dec. 15, 2023) (stating "the trial court should consider whether the nature and degree of the asserted noncompliance justifies termination under the totality of the circumstances").

(stating "the trial court should consider whether the nature and degree of the asserted noncompliance justifies termination under the totality of the circumstances"). Thus, Mother's failure to comply with these requirements of her FSP is sufficient to support termination of Mother's parental rights under Section 161.001(b)(1)(O).

### 3. Conclusion

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that Mother failed to comply with the terms of her FSP by failing to maintain stable and safe housing, maintain contact with the Department, "participate in an initial drug/alcohol test," "participate in the case by attending court hearings, visitations with her child, and all other [Department] required meetings," "not incur additional charges," and "continue to abide by the terms regarding her current case." *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re R.J.G.*, 2023 WL 8655998, at *9 (stating "single or slight violation of . . material service plan provisions *could* justify termination"). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Mother failed to comply with the terms of her FSP. *In re J.F.C.*, 96 S.W.3d at 266; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

We overrule Mother's first issue.

## C. Best Interest of Child

In her second issue, Mother argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of her parental rights was in Beth's best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

### 1. Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *See In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the

persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

We may also consider the statutory factors set forth in Texas Family Code Section 263.307, including: (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family

demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating findings under Subsection (O) can support the best interest finding); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

## 2. Analysis

Mother argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of her parental rights was in Beth's best interest because Beth was not living in an adoptive placement at the time of trial, Mother's two visits with Beth were appropriate, Mother resolved her past income and housing deficiencies, she completed the services required of her, and she never physically harmed Beth.

Mother's best interest analysis focuses primarily on the lack of a permanent adoptive placement for Beth at the time of trial. While the child's need for permanence and stability is a paramount consideration in the best-interest determination, the lack of a permanent placement at the time of trial is not dispositive of the issue. *See In re E.C.R.*, 402 S.W.3d at 250 (affirming best interest finding when Department's "long term goal for [child was] unrelated adoption, although there was no evidence that his foster family would, or would not, adopt him"); *In re B.J.C.*, 495 S.W.3d at 39 (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination); *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("A child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in a best-interest determination.").

The Department's primary concern in this case stems from Mother's failure to provide Beth with a stable environment for most of the child's life. During the first three years of Beth's life, Mother and Beth lived in Mother's apartment in California, Sarah's home in California, and homes in Texas and Virginia. According to Mother, she and Beth were in the process of moving back to California from Virginia when Beth was taken into care in Houston in June 2022. Mother testified that she lived in Houston for three months after Beth was removed from her care and then returned to California to see Victoria. The record also reflects that Mother, who "acknowledges she was transient during portions" of Beth's case, did not remain in California. Rather, Mother reported to Green in January 2023 that she was living out of her car in Alabama, and Mother traveled to Louisiana where she was arrested and spent time in jail before being released in February 2023.[24] Mother also testified that she stopped paying rent on her apartment in California and lived in a hostel in Los Angeles for a month before moving to Texas. At the March 23, 2023 hearing, Mother told Green she was renting an apartment in Houston.

As previously discussed, Mother failed to demonstrate that she had maintained a safe and stable home for a minimum of six consecutive months. *See In re E.C.R.*, 402 S.W.3d at 249 (stating findings under Subsection (O) can support the best interest finding); *see also In re B.S.W.*, No. 14–04–00496–CV, 2004 WL

---

[24] There is no evidence in the record indicating why Mother was jailed in Louisiana.

2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) (stating parent's failure to show that she is stable enough to parent child for any prolonged period entitles trial court "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption"). Based on the evidence presented at trial, the trial court also reasonably could have concluded that Mother's failure to maintain stable housing until just before trial subjected Beth to a life of uncertainty and instability. *See In re B.N.D.*, No. 04-21-00286-CV, 2021 WL 6127883, at *4 (Tex. App.—San Antonio Dec. 29, 2021, no pet.) ("Mother's lack of stable housing and a consistent home environment exposed the children to a life of uncertainty and instability that endangers the children's physical and emotional well-being."); *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *7 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (stating that parent's failure to obtain and maintain stable housing and employment through eighteen-month pendency of case subjected her children to life of uncertainty and instability, endangering their physical and emotional well-being).

The trial court could also reasonably conclude from this evidence that Mother's inability to maintain stable housing prior to Beth coming into the Department's care and during the duration of Beth's case would continue in the future if Beth were returned to Mother's care, thus subjecting her to further instability and uncertainty. *See In re D.M.*, 452 S.W.3d at 471(stating factfinder

68

may infer parent's past endangering conduct may recur if child is returned to parent when assessing whether termination is in child's best interest); *In re O.N.H.*, 401 S.W.3d at 684 ("[I]t is proper to measure a parent's future conduct by his or her past conduct to determine whether termination is in the child's best interest.").

A parent's criminal conduct, convictions, and imprisonment also endangers a child's physical and emotional well-being because it subjects the child to a life of uncertainty and instability. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child.") (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (noting evidence of parent's inability to maintain lifestyle free from arrests and incarcerations is relevant to best-interest determination); *see also In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (stating child is subjected "to ongoing uncertainty regarding who will take care of him" when "parent repeatedly commits criminal acts that subject the parent to incarceration").

It is undisputed that Beth was taken into care when Mother was arrested on an outstanding warrant on a felony fraud charge and Mother did not have a caregiver for Beth, thus necessitating Beth's removal from Mother's care. A month before

trial, Mother pleaded guilty to the fraud charge and was placed on deferred adjudication community supervision. During the pendency of Beth's case, Mother was also arrested and charged with assault and jailed for an unknown reason and duration in Louisiana.[25] A second warrant for Mother's arrest was issued during the pendency of this case after Mother, who returned to California, failed to make another appearance in her fraud case. Mother's failure to refrain from picking up additional criminal charges and abide "by the terms regarding her current [fraud] case" not only demonstrate that Mother did not comply with the requirements of her FSP, but such evidence can also support a finding that termination of her parental rights is in Beth's best interest. *See In re E.C.R.*, 402 S.W.3d at 249 (stating findings under Subsection (O) can support the best interest finding). Furthermore, Mother's arrest in June 2022 caused her to be absent from Beth's life and unable to care for her child, and the trial court could infer from Mother's past conduct, particularly her assault charge, which was later dismissed, and the time she spent in jail in Louisiana during the pendency of the case, that such endangering conduct could recur in the future, thus exposing Beth to further uncertainty and instability. *See In re D.M.*, 452 S.W.3d at 471 (stating factfinder may infer parent's past endangering conduct may

---

[25] On February 24, 2023, Mother informed Green that "she was in Louisiana because she had just gotten out of jail." There is nothing in the record, however, indicating why Mother was arrested in Louisiana, whether charges were filed against Mother, or when the underlying offense that led to her arrest allegedly occurred.

70

recur if child is returned to parent); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (concluding that although criminal charges were ultimately dismissed, charges supported termination of parent's rights because each time mother was jailed, she was absent from child's life and unable to provide for child's physical and emotional needs during that time).

The Department's plan is for Beth to remain in her foster placement, and it requested the trial court's permission to place Beth with Sarah if Sarah's ICPC is approved. Mother, who "does not contest whether the current foster home is stable," argues it "is not an adoptive placement and therefore irrelevant." Mother further argues that "the lack of an approved ICPC regarding [Sarah's] home subjects [Beth] to the possibility of languishing in foster care," and thus the stability of the home weighs against a best interest finding. Mother also argues that although Sarah has been "identified as a potential adoptive placement, . . . this placement is still speculative at best and is not a guarantee of permanency."

We disagree that the stability of Beth's foster home and possible placement with Sarah are not relevant for purposes of our best-interest analysis. *See In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering fact that child was healthy and doing well in foster home even though that was not potential adoptive placement); *In re J.R.*, No. 14-01-01042-CV, 2002 WL 31318790, at *15 (Tex. App.—Houston [14th Dist.] Oct. 17, 2002, no pet.)

71

(considering evidence that non-adoptive foster placement who was willing to care for special needs child "indefinitely" was meeting emotional, academic, and social needs of child with special needs for purposes of best-interest analysis).

Sarah testified that she thought it was important for Beth to be with Victoria and "have some stability and some permanency." Sarah, who has cared for Beth for extended periods of time in the past, testified that she is willing to provide Beth with a stable home if Mother's parental rights are terminated. Beth's foster father testified that although they were not able to adopt Beth, they were willing to remain a long-term placement for her until her permanent home could be found. By all accounts, Beth is flourishing in her current foster placement, and her foster parents are meeting all of her physical, emotional, and developmental needs. According to Green, Beth has made "great progress" and is "thriving" in her foster home due to the speech therapy she was receiving and the "very stable and predictive schedule" her foster family provided. Thus, even if Sarah's ICPC is not approved, the record reflects that Beth will remain in a safe and stable home with her foster family until the Department locates a permanent placement for Beth.

We thus conclude that, notwithstanding the lack of certainty regarding a permanent placement for Beth at the time of trial, the Department's plans for Beth and the stability of the home or proposed placement weigh in favor of the trial court's finding that termination of Mother's parental rights is in Beth's best interest. *See In*

72

*re E.C.R.*, 402 S.W.3d at 250 (affirming finding of best interest when there was evidence child's foster family was meeting his physical and emotional needs, but Department had not identified permanent placement for child and "there was no evidence that his foster family would, or would not, adopt him").

### 3. Present and Future Danger to Child's Physical and Emotional Wellbeing

Mother argues that the present and future emotional and physical danger to the child weighs against the trial court's best interest finding because there is no evidence that she ever physically harmed Beth. Endangerment, however, is not so limited. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *In re S.R.*, 452 S.W.3d at 360 (same); *see also Holley*, 544 S.W.2d at 371–72 (identifying present and future danger to child's physical and emotional wellbeing as best-interest factor). As previously discussed, the trial court could have reasonably concluded from the evidence presented at trial of Mother's transient, nomadic lifestyle and her arrests and criminal charges, that Mother had exposed Beth to a life of uncertainty and instability, thus endangering Beth's present and future physical and emotional wellbeing. The trial court also could have reasonably concluded that Mother did not provide Beth with a safe and stable environment based on Sarah's testimony that she was concerned about Beth because Mother had admitted to Sarah that she had taken

73

marijuana and methamphetamine, and Mother associated with drug addicts and homeless people, and "it's not healthy for the child to be around drug use or with that type of lifestyle." We thus conclude this factor weighs in favor of a finding that termination of Mother's parental rights is in Beth's best interest.

### 4. Present and Future Physical and Emotional Needs of the Child

With respect to Beth's present and future physical and emotional needs, Mother argues this factor weighs against a finding that termination of her rights is in Beth's best interest because her "income and housing deficiencies have been rectified," she sought medical care for Beth's speech delay before Beth came into care, and Mother testified that she would continue Beth's speech and occupational therapy if Beth was returned to her care.

Mother, who receives $1,450 a month in SSDI and $650 in food stamps, testified that her SSDI income is sufficient to support her and Beth.[26] However, Green testified that Mother did not provide monetary assistance for Beth, send Beth clothes, food, or gifts, or otherwise do anything to benefit Beth from June 2022 to February 2023 and Sarah, who had provided financial assistance to Mother when Mother and Beth were living in Virginia to ensure she could afford heat and utilities, testified that Mother had not provided any monetary assistance for Victoria since Mother moved out of Sarah's home in September 2020. Mother acknowledged her

---

[26] She pays $900 a month in rent and is planning to buy a car.

failure to provide for her children and testified that she wanted to provide for Victoria and Beth, but she was not able to do so the last year. Even assuming Mother was able to rectify her income deficiency as she argues, as previously discussed, Mother failed to demonstrate that she had maintained a safe and stable home for a minimum of six consecutive months, which supports a finding that termination of Mother's rights is in Beth's best interest. *See In re E.C.R.*, 402 S.W.3d at 249 (stating findings under Subsection (O) can support the best interest finding).

Although Mother testified that she was going to enroll Beth in speech therapy when they were living in California after a doctor recommended it, it is undisputed that Mother did not enroll her in speech therapy prior to Beth coming into care. While Mother testified she would continue Beth's speech and occupational therapy if Beth was returned to her care, the trial court was within its province to disbelieve Mother's testimony, especially given the lack of stability in Mother's life.

As previously discussed, Beth was taken into the Department's care when Mother was arrested on an outstanding warrant in her fraud case, and she was unable to identify a caregiver for Beth. Mother was also arrested and charged with assault in November 2022 and jailed in Louisiana while Beth's case was pending. This evidence also supports a finding that termination of her parental rights is in Beth's best interest. *See In re T.G.R.-M.*, 404 S.W.3d at 15 (concluding that although criminal charges were ultimately dismissed, charges supported termination of

75

parent's rights because each time mother was jailed, she was absent from child's life and unable to provide for child's physical and emotional needs during that time).

On the other hand, it is undisputed that Beth is thriving in foster care and her foster family has been able to meet all of her physical and emotional needs. Sarah testified that she is willing to provide Beth with stability and permanency should Mother's parental rights be terminated and there is no evidence demonstrating otherwise.

We thus conclude this factor weighs in favor of a finding that termination of Mother's parental rights is in Beth's best interest.

### 5. Substantial Compliance with FSP and Improved Circumstances

Mother argues that her substantial compliance with her FSP and recent efforts to improve her life weigh against the trial court's best-interest finding. A parent's substantial compliance with their FSP and recent efforts to improve their life are relevant for purposes of determining whether termination of the parent's parental rights is in the child's best interest. *See In re M.C.G.*, 329 S.W.3d 674, 675 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (stating parent's excuse for failing to complete FSP goes to best-interest analysis); *In re N.L.C.*, 412 S.W.3d 810, 823 (Tex. App.—Texarkana 2013, no pet.) (considering evidence parent recently improved their life weighs when conducting best-interest analysis).

Mother testified she completed parenting classes that were not required by her FSP, and she complied with most of the requirements of her FSP by, among other things, completing a psychosocial and substance abuse assessment and providing Green with proof of her monthly SSDI payments and a one-year lease for an apartment in Houston. Even if we agree that Mother substantially complied with her FSP, Mother failed to abide by material terms of the FSP, among them the requirements to maintain safe and stable housing for a minimum of six months, maintain contact with the Department, participate in the case by attending court hearings and visitations with Beth, refrain from incurring additional charges, and abide by the terms in her fraud case. Mother's substantial compliance thus would, at most, weigh slightly, if at all, against a finding that termination of Mother's parental rights is in Beth's best interest. *See In re B.U.*, No. 02-23-00150-CV, 2023 WL 5967604, at *6 n.11 (Tex. App.—Fort Worth Sept. 14, 2023, no pet. h.) (mem. op.) (holding parent's substantial compliance with FSP "weighs only slightly, if at all, against the trial court's best-interest finding" given parent's failure to comply with requirement to maintain safe and stable home for child and noting such substantial compliance "is certainly not significant enough to prevent the trial court from reasonably forming a firm belief or conviction that termination was in [child's] best interest").

While evidence that a parent has improved their circumstances weighs against a best-interest finding, such improvements, particularly those made on the eve of trial, cannot conclusively negate past endangering behavior. *See In re J.O.A.*, 283 S.W.3d at 346 (stating "[w]hile recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value" of past behavior); *Jordan*, 325 S.W.3d at 732 ("Although evidence shows [the mother] has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices."). As discussed, Mother and Beth moved at least four times before Beth was taken into the Department's care and Mother, who moved between California, Texas, Alabama, and Louisiana before trial, continued her transient lifestyle during the pendency of the case. Although she leased an apartment in Houston with a one-year term, the lease commenced only two weeks before trial. *See In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating "factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination"); *see also In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (holding father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect" for purposes of best-interest analysis). The trial court reasonably could have concluded that the

recent improvements in Mother's circumstances were of too short a duration to negate Mother's past history and impact the best-interest determination. *See In re S.R.*, 452 S.W.3d at 368 (stating parent's recent improvements "are too late to have an impact on the best-interest determination"); *see also In re P.R.W.*, 493 S.W.3d 738, 744 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) (mem. op.) (stating "even strong evidence of improvement cannot conclusively negate past history").

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in Beth's best interest. *See In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in Beth's best interest. *Id.*; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

We overrule Mother's second issue.

## Conclusion

We affirm the trial court's decree of termination.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.